**Leo SHORTER, Plaintiff,**

v.

**MEMPHIS LIGHT, GAS & WATER COMPANY, Defendant.**

No. 02–2009 D/BRE.

United States District Court,
W.D. Tennessee,
Western Division.

March 25, 2003.

Linda Kendall Garner, Esq., Law Office of Linda Kendall Garner, Memphis, TN, for Leo Shorter, plaintiff.

Elijah Noel, Jr., Esq., Harris Shelton Dunlap Cobb & Ryder, Memphis, TN, for Memphis Light Gas & Water Division, defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DONALD, District Judge.

Before the Court is Defendant Memphis Light, Gas, & Water Company ("MLG &

W")'s motion for summary judgment. Plaintiff Leo Shorter ("Shorter") asserts claims for discrimination based on race, hostile work environment/racial harassment, and retaliation, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* In support of the motion for summary judgment, Defendant argues that 1) claims premised upon discrete acts occurring more than 300 days prior to the filing of Plaintiff's initial Equal Employment Opportunity Commission ("EEOC") Charge are time-barred, 2) insufficient evidence exists to raise a timely claim of hostile work environment/racial harassment, and 3) Plaintiff failed to establish prima facie cases of race discrimination and retaliation. Moreover, Defendant asserts that even if Plaintiff established prima facie cases, Defendant had legitimate, non-discriminatory reasons for its actions which Plaintiff failed to establish were pretextual. The Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the following reasons, the Court grants in part and denies in part Defendant's motion for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1985, Plaintiff, a 55 year-old African–American male, began working for Defendant. Pl.'s Am. Resp. To Def.'s Mot. For Summ. J.("Pl.'s Am. Resp.") p. 1. For approximately two years, Plaintiff performed the job of a pre-apprentice mechanic's helper ("mechanic's helper") in MLG & W's Department of Transportation ("DOT"). *Id.* Thereafter, Plaintiff completed a four-year apprentice mechanic program, and then progressed to the position of journeyman mechanic ("mechanic") after successfully completing the Mechanic's Top Out Test ("MTOT") and the Hands On Test. *Id.* Plaintiff worked as a mechanic from 1991 through December 31,

1997. *Id.* From August 26, 1985 through December 31, 1997 Plaintiff received satisfactory job performance evaluations, with the exception of one written reprimand in 1991 for the unauthorized use of a company vehicle and leaving the workplace without permission. *Id.,* Ex. B.

On February 19, 1997, Plaintiff passed the MTOT a second time. *Id.* at 2. A passing score on the MTOT remained valid for five years. *Id.* On December 18, 1997, a crew leader mechanic ("crew leader") position became available. *Id.* To be a crew leader, an employee was required to successfully complete the MTOT and be in the "line of progression." [1] *Id.* Effective January 1, 1998, Defendant promoted Plaintiff to the vacant position of second shift, crew leader of the Heavy Equipment Shop because he passed the MTOT and was next in the line of progression. *Id.* Matt Brown, a Caucasian male, had more seniority than Plaintiff at the time position became available, however, Mr. Brown did not have a current, passing score on the MTOT. *Id.,* Ex. D.

Tim Dunahoo was Plaintiff's foreman at the Heavy Equipment Shop, and George Slager was Mr. Dunahoo's supervisor. *Id.* Both individuals are Caucasian. *Id.* On June 8, 1998, Plaintiff applied for a foreman position in MLG & W's DOT. *Id.* Plaintiff maintains that he made repeated verbal and written inquiries to management about attending the Foreman Development Training class. Plaintiff alleges, however, that he received no response to his inquiries for several months. *Id.* Plaintiff contends that he later received an impromptu telephone call from Mr. Slager, advising him to report to the training center. *Id.* at 2–3. Plaintiff asserts, however, that he was informed that he was to take a test rather than receive training after reporting to the training center. *Id.* at 3. As

---

**1.** Based on the record, the Court presumes that "line of progression" refers to seniority.

a result, Plaintiff alleges that he failed the exam. *Id.*

From June through October 1998, Mr. Dunahoo wrote a series of personal notations, which were added to Plaintiff's file, memorializing complaints and concerns that Mr. Dunahoo had about Plaintiff's documentation abilities. *Id.*, Ex. F. Plaintiff's employment file indicates that on October 12, 1998, Mr. Dunahoo gave Plaintiff a typewritten note which stated that "it is [Plaintiff's] responsibility to make sure that your paper work [sic] is correct. Please put more effort into this area of your job." *Id.* On November 11, 1998, Plaintiff received an oral reprimand from Mr. Dunahoo for turning in incomplete or incorrect paperwork. *Id.*

On December 15, 1998, and January 5, 1999, Plaintiff received overall ratings of "effective" on performance appraisals. Mr. Dunahoo noted, however, that Plaintiff needed to continue his improvement in the areas of paperwork and decision-making. *Id.* On March 31, 1999, Mr. Dunahoo issued Plaintiff a written reprimand, also signed by Mr. Slager, for improperly modifying equipment. Aff. of Timothy D. Dunahoo ("Dunahoo") ¶ 9, Ex. 6.

On April 12, 1999, Mr. Dunahoo performed Two Minute Review of Plaintiff's performance in which he rated Plaintiff's performance as "effective," with a notation that Plaintiff's paperwork was much improved. Pl.'s Am. Resp. p. 3, Ex. J. Mr. Dunahoo attested that he performed Two Minute Reviews and other performance appraisals of all mechanics and crew leaders that he supervised and that the purpose of the reviews was to allow the employees to know their performance level. Aff. of Dunahoo ¶ 4. On June 23, 1999, Mr. Dunahoo performed another Two Minute Review of Plaintiff, in which he gave Plaintiff an overall performance rating of "effective," but noted that Plaintiff needed improvement in the areas of leadership, problem analysis and decision-making, and paperwork. Pl.'s Am. Resp. p. 3, Ex. J. Specifically, Mr. Dunahoo opined that Plaintiff "[did] not leave details on ongoing work ... [but] seem[ed] to be making efforts to improve." *Id.*

On July 22, 1999, Plaintiff received a written reprimand for failure to 1) install a windshield control module delay and 2) leave a note informing Mr. Dunahoo of the location of the module. Aff. of George M. Slager ("Slager") ¶ 9. Plaintiff challenged the written reprimand through his union grievance procedure. Pl.'s Am. Resp. p. 3, Ex. K. Plaintiff, Mr. Slager, Mr. Dunahoo, and Rick Rethea, the Union Steward, were present during grievance hearing which was held on March 23, 2000. *Id.* After the hearing, the reprimand was downgraded to an oral reprimand. Aff. of Slager ¶ 9. Plaintiff asserts that, after the hearing, Mr. Slager told him that he "had better dot every 'i' and cross every 't.'" Pl.'s Am. Resp. p. 3, Ex. K. Plaintiff also asserts that, after this hearing, his performance evaluations began to steadily decline and that other employees knew that George Slager was out to "get him." *Id.*

On September 21, 1999, Plaintiff replaced the break pads on a vehicle, but did not pump the break pedal after finishing. Aff. of Slager ¶ 10. When Plaintiff moved the vehicle, the breaks failed to work, causing the vehicle to crash into a wall. *Id.* On October 1, 1999, Mr. Dunahoo performed a Two Minute Review in which he found that Plaintiff "need[ed] improvement" in several areas, including quality of work, quantity of work, leadership, and paperwork. Pl.'s Am. Resp. p. 3, Ex. K. Plaintiff received an overall performance rating of "needs improvement." *Id.*

On October 25, 1999, Plaintiff, John Collins (then Manager of MLG & W's DOT), Paul Brasfield (MLG & W's DOT Training Coordinator), Mr. Dunahoo, and Mr. Slag-

er had a meeting to discuss the need for Plaintiff to improve his paperwork and performance as a crew leader. Aff. of Slager ¶ 12; Aff. of John Collins ("Collins") ¶ 3, Ex. A. Mr. Collins attested that Plaintiff expressed to him that he felt that the atmosphere in the shop was tense or hostile, causing him to make mistakes. Aff. of Collins ¶ 3, Ex. A. Mr. Collins asserts that he told Plaintiff that Mr. Dunahoo was "doing his job by documenting strengths and weaknesses on a performance review. Further[,] the purpose of the review was to identify any weaknesses to provide the employee an opportunity to improve performance." *Id.* Mr. Collins maintains that he also told Plaintiff that he spoke to Mr. Brasfield about providing Plaintiff with training in areas in which Plaintiff had received low performance evaluations and reprimands and in areas where documentation reflected that Plaintiff had difficulty making repairs. *Id.* Mr. Collins attested that Plaintiff agreed to training, and Mr. Slager maintained that such training continued through December 1999 and January 2000. *Id.;* Aff. of Slager ¶ 12, Exs. I, J.

Plaintiff, however, disagrees with Mr. Collins' account of the October 25, 1999 meeting and the occurrence of events thereafter. Pl.'s Am. Resp., Ex. N, Aff. of Pl. ¶ 7. With respect to the proposed training discussed by Mr. Collins at the October 25, 1999 meeting, Plaintiff asserts that Mr. Slager advised him to report to Frances Brewer, a Training Coordinator at MLG & W, to receive paperwork training. *Id.,* Ex. N, Aff. of Pl. ¶ 1. Plaintiff reported to the training center on December 16, 1999. *Id.,* Ex. N, Brewer Ex. 1. Ms. Brewer indicated that Plaintiff told her that he was not informed of the reason he was to report to the training center. *Id.* At the training session, Ms. Brewer administered "some" McGraw–Hill tests to Plaintiff. *Id.* Mr. Slager asserted in an affidavit that, on December 22, 1999, he

received Ms. Brewer's written assessment of Plaintiff's December 16, 1999 training session, which also indicated that Mr. Slager has spoken with Ms. Brewer about Plaintiff's training session. *Id.* at 12, Ex. J. However, Mr. Slager denied during deposition testimony that he saw Ms. Brewer's assessment of Plaintiff's December 16, 1999 training session or that he spoke with Ms. Brewer about Plaintiff's training session. Pl.'s Am. Resp., Ex. O, Slager Dep. pp. 81–82. The assessment indicated that Plaintiff did not follow directions well. *Id.*

Ms. Brewer testified that she discarded all documents related to Plaintiff's training when she moved to a new office. *Id.,* Ex. N, Brewer Dep. pp. 10–14. Ms. Brewer stated, however, that she did not know of Plaintiff's pending litigation when she discarded the documents. *Id.*

Plaintiff attested that the training he received from Ms. Brewer "consisted of her giving [him] a piece of paper and asking [him] to follow instructions and complete the assignment." *Id.,* Ex. O, Aff. of Pl. ¶ 3. Moreover, Plaintiff maintained that Ms. Brewer never pointed out his errors, nor did she provide him feedback. *Id.* at ¶ 5. Likewise, Plaintiff stated that he was never provided any equipment repair training as indicated by Mr. Collins, except for training on the "digger derrick," which all mechanics received following a serious accident involving the operation of such a machine. *Id.* at ¶ 6.

At some time during or after the October 25, 1999 meeting, Mr. Collins asserts that he told Mr. Dunahoo and Mr. Slager, as Plaintiff's immediate supervisors, to document Plaintiff's performance so he could determine whether Plaintiff was capable of performing the job of crew leader and whether Mr. Slager and Mr. Dunahoo made appropriate efforts to help Plaintiff improve his performance. Aff. of Collins ¶ 4. On October 27, 1999, Plaintiff received

a written reprimand for poor job performance and an oral reprimand pursuant to MLG & W's driver accountability program from Mr. Slager based on the September 21, 1999 "failure to pump break pedal, with resulting accident" incident. Aff. of Slager ¶ 10. Mr. Slager attested that Plaintiff admitted during a meeting, attended by Plaintiff, Mr. Dunahoo, Mike Tudor, a representative of MLGW's Safety Services, and Mr. Slager, that Plaintiff did not pump the brake pedal when asked about the cause of the accident. *Id.*

On December 20, 1999, Mr. Dunahoo completed a performance appraisal of Plaintiff. Aff. of Dunahoo ¶ 11, Ex. 8. Plaintiff received an overall rating of "needs improvement," and the appraisal noted that Plaintiff needed to improve his written communication skills, paperwork, and technical knowledge required to repair automotive vehicles. *Id.*

Mr. Collins decided in fall of 1999 to eliminate the second shift of the Heavy Equipment garage. Aff. of Slager ¶ 14. Plaintiff was initially reassigned to the first shift of the Heavy Equipment garage, however, it was later determined that a crew leader was not needed on the first shift. *Id.* Plaintiff therefore was transferred in mid-December 1999 to Defendant's North Service Center garage in the position of crew leader of the third shift. *Id.* at 15. From the time of Plaintiff's transfer until March 1, 2000, Plaintiff's immediate supervisor/foreman was Kevin Jackson, a Caucasian male. *Id.*

On February 14, 2000, Mr. Slager suspended Plaintiff for one day (February 16, 2000) for failure to perform preventative maintenance ("PM") inspections satisfactorily. The letter suspending Plaintiff was dated January 14, 2000, however, the word "January" was marked thru and the word "February" was handwritten underneath. *Id.* at ¶ 16, Ex. L. The letter stated that Mr. Slager inspected three trenchers at the North Service Center on February 9, 2000, and found all three to have worn out components. *Id.* Furthermore, Mr. Slager asserted that Plaintiff had inspected the trenchers on January 20–21, 2000, indicating that the preventative maintenance ("PM") inspections were not performed satisfactorily. *Id.* Mr. Slager later testified that the trenchers had not been moved since January 20–21, 2000. Dep. of Slager pp. 63–67. One of the trenchers, however, apparently had been moved because Defendant's records indicate that from January 20, 2000, through February 8, 2000, the equipment had an increase of 20 meter hours. Pl.'s Am. Resp., Ex. Q. Stewart Webb, William McBride, and Clifton Milton, all Caucasians, performed repairs on the trencher on February 8–9, 2000. *Id.* Plaintiff asserted that all of the trenchers had been in service in excess of twenty-five hours, before Mr. Slager performed the February 9, 2000 inspection. Dep. of Pl. pp. 179–80. Mr. Dunahoo also stated that Mr. Slager normally did not perform PMs. Dep. of Dunahoo pp. 48–49.

On February 9, 2000, Kevin Jackson gave Plaintiff a performance appraisal of "needs improvement" on a Two Minute Review. Pl.'s Am. Resp., Ex. V. The review indicated that Plaintiff "did not complete PM list" in one instance, but later states that Plaintiff "did complete PM list." *Id.* Mr. Jackson also wrote a letter, dated February 3, 2000, to Mr. Slager in which he told Mr. Slager that Plaintiff and the third shift of the North Service Center failed to complete the PMs for January 2000. *Id.* Defendant's computerized printouts indicate that there were no incomplete PMs at the North Service Center during January 2000 or February 2000. *Id.*

On March 1, 2000, Mr. Collins demoted Plaintiff from crew leader to mechanic. *Id.*, Ex. W. Mr. Collins asserted that Plain-

tiff failed to perform at an acceptable level as crew leader, and he was satisfied that appropriate efforts had been made to help Plaintiff overcome his deficiencies. Aff. of Collins ¶¶ 5,6, Ex. B. Plaintiff remained at the North Service Center garage, but was moved to the day shift. *Id.* Robert Allen Williams, Jr., served as Plaintiff's foreman. *Id.*

On March 8, 2000, Matt Brown replaced Plaintiff in the position of crew leader of the third shift. Pl.'s Am. Resp. p. 5. Mr. Brown did not have a valid MTOT score when he assumed the position. *Id.*, Ex. D. On March 13, 2000, Plaintiff filed a grievance challenging his demotion from crew leader to mechanic. *Id.*, Ex. X. The grievance was denied on April 3, 2000. *Id.*

From March 8, 2000 through October 30, 2000, Mr. Williams made numerous written notes concerning Plaintiff's performance and activities. Aff. of Robert Allen Williams, Jr. ("Williams") ¶¶ 4–38. Mr. Williams attested that he made notes regarding all mechanics who he supervised and then referred to his notes to complete Two Minute Reviews and performance appraisals. *Id.* at ¶ 38. Mr. Williams also stated that of the mechanics he supervised Plaintiff's performance was most frequently inadequate. *Id.*

Mr. Williams also performed numerous Two Minute Reviews and two performance appraisals of Plaintiff between March 2000 and March 2001. *Id.* at ¶ 39. Plaintiff's Two Minute Reviews, dated March 31 and May 5, 2000, indicate that he received overall performance ratings of "needs improvement" and that Plaintiff needed improvement in the areas of work quality, work quantity, job knowledge, and dependability. *Id.* On April 25, 2000, Mr. Slager suspended Plaintiff for five-days because of poor diagnosis of problems needing repairs. Aff. of Slager ¶ 18, Ex. N. The suspension form stated that the incidents for which Plaintiff was being disciplined were "two examples of [his] poor diagnostic skills and workmanship that cause[d] [Defendant's] customers not to have their equipment when they need[ed] it." *Id.* On April 26, 2000, Plaintiff filed an internal charge of race discrimination with the Equal Employment Compliance ("EEC"), alleging harassment, failure to promote, and refusal to provide training. Pl.'s Am. Resp., Ex. 1. Plaintiff alleged that Mr. Slager, Mr. Dunahoo, Mr. Williams, and Mr. Collins were the perpetrators of the discrimination against him. *Id.*

Mr. Williams performed additional Two Minute Reviews of Plaintiff on June 12, July 12 and September 8, 2000. Plaintiff's overall performance ratings on these reviews were listed as "effective" with the comment "showing some improvement in job performance"—June 12, 2000; "effective" with the comment "needs to continue with improvements on job performance and attendance"—July 12, 2000; and "unsatisfactory"—September 8, 2000. Aff. of Williams ¶ 39, Exs. 29–35. On October 31, 2000, Mr. Williams completed a performance appraisal of Plaintiff, which Mr. Slager approved, for the period of March 1, 2000 to October 31, 2000. *Id.* at ¶ 40, Ex. 37; Aff. of Slager ¶ 19. Mr. Williams rated Plaintiff's overall performance as "unsatisfactory." *Id.* Plaintiff received a rating of "unsatisfactory" in the areas of quality of work, quantity of work, job knowledge, and dependability. Aff. of Williams ¶ 40, Ex. 37. Mr. Williams' comments on the appraisal include statements such as "quality of repairs are not up to standard's due to come back's [sic]," "has a very limited knowledge," and "needs more training in trouble shooting and diagnostic skills." *Id.* Mr. Williams also stated that Plaintiff was offered additional training but refused it. *Id.* Plaintiff, however, indicated on the employee comment section of the review that he was not offered additional training. *Id.*

On October 10, 2000, the EEC of MLG & W issued a letter finding no cause. Pl.'s Am. Resp., Ex. 3. The letter provided that Plaintiff "alleged that he was discriminated against by [his managers] by [being given] harsher discipline than his white co-workers, and retaliated against because of previous grievances filed because of his race [ ]." *Id.* The letter further notified Plaintiff that he had 300 days from the date of the alleged occurrence to file a charge with the EEOC. *Id.*

On November 13, 2000, Mary Helen Lovett, the acting DOT Manager; Plaintiff; Mr. Slager; Mr. Williams; and other members of management and personnel met to discuss Plaintiff's most recent performance. Aff. of Slager ¶ 20, Ex. P. On November, 20, 2000, Ms. Lovett memorialized the discussion from the November 13, 2000 meeting in a letter. *Id.* The letter stated that Plaintiff had 90 days to improve his ability to 1) evaluate the equipment and make the necessary repairs; 2) order parts necessary for repair at the beginning of the job; 3) use all available diagnostic equipment; 4) make repairs in a timely manner; and 5) make the proper repairs. *Id.* Furthermore, the letter indicated that Plaintiff stated that he needed a new supervisor and foreman, and training on all equipment, specifically the Terex crane and the digger derrick "c" PMs, when asked what he needed in order to improve his performance. *Id.* The letter also stated that, to help Plaintiff improve his performance, management would 1) ask Plaintiff questions when he ordered parts in order to determine that proper diagnosis was occurring, 2) immediately discuss with Plaintiff any problems when an incident occurred instead of waiting until Plaintiff's review, 3) train Plaintiff for the "c" PMs, 4) for a three month period, place Plaintiff on a different shift with a different manager, and 5) assist Plaintiff during repair evaluation. *Id.* A written notation on the letter indicates that Plaintiff refused to move to a different shift with a different foreman. *Id.*

After the 90 day period ended, on March 1, 2001, Mr. Williams completed a performance evaluation of Plaintiff for the period of November 1, 2000 to February 28, 2001. Aff. of Williams, Ex. 37. Plaintiff received an overall performance evaluation of "unsatisfactory." *Id.* In the areas of quality of work, quantity of work, dependability, and material utilization, Plaintiff received a rating of "unsatisfactory." *Id.* Mr. Williams stated that Plaintiff's quality of repairs were not up to standard because of Plaintiff's "come back" work, poor diagnosis, and troubleshooting skills. *Id.* The evaluation also stated that Plaintiff had a very limited knowledge, and needed training in troubleshooting, diagnostic skills, and basic electrical repairs. *Id.* Effective March 1, 2000, Ms. Lovett recommended to MLG & W's Personnel Department that Plaintiff be demoted from mechanic to mechanic's helper and reassigned to Defendant's Brunswick Service Center garage. Aff. of Slager 24, Ex. R. The Personnel Department approved the demotion. *Id.*

Plaintiff asserts that sometime during 2001, after his transfer to the Brunswick Road Garage and demotion to mechanic's helper, Kevin Jackson, Plaintiff's previous foreman, told him that "[y]ou can be right and although you're right, you'll be wrong." Dep. of Pl. p. 49. Manuel Luna, a Hispanic–American, stated that he recalled an instance in 2001 when Kevin Jackson made the comment, while discussing Mr. Jackson's former residence, that "as soon as one of the blacks moved in to [sic] that neighborhood he knew that the neighborhood was going to go down...." Dep. of Luna pp. 8–9. Mr. Luna also asserted that a mechanic once called him an "F-ing wetback." *Id.* at 10. No supervisor nor foreman was present when the mechanic made the comment, and Mr.

Luna did not report the incident to anyone. *Id.* Mr. Luna further stated that he heard of rumors of racial remarks being made, although he could not recall what they were. *Id.*

Likewise, James Summers, an African–American mechanic, maintained that midyear 2000 he heard Chris Proctor say that Mr. Proctor heard someone make the comment that "[i]f it wasn't for these dumb-ass n[------] we would have a better place to work." Dep. of Summers p. 10. Mr. Summers further stated that he did not know whether Mr. Proctor's statement was true or whether Mr. Proctor was trying to stir up trouble. *Id.* The incident, however, was never reported to a member of management. *Id.* at 10–13. Mr. Summers also stated that Kevin Jackson once made the statement that "the Civil War wasn't over." *Id.*

Huberto Tagavilla, a Filipino–American foreman, asserted that during the 1970's and/or early 1980's he heard people at work make racially derogatory phrases, such as "a dumb n[------]." Dep. of Tagavilla pp. 8–13. Mr. Tagavilla further maintained that he had not heard any racial remarks in the last ten years. *Id.* at 10. Mr. Tagavilla did opine, however, that he felt that he was being harassed and that the work environment appeared to be reverting back to a 1960's mentality. *Id.* at 13. Mr. Tagavilla stated that he did not have any facts to support his feelings. *Id.*

Kevin Jackson admitted that he heard that James Fowinkle, a Caucasian crew leader who Mr. Jackson supervised, came to work intoxicated and was taken home by Roy Brown, an African–American Supervisor. Dep. of Jackson pp. 21–22. Mr. Jackson apparently was not Mr. Fowinkle's foreman at the time of the incident. *Id.* Mr. Jackson stated that during the time that he supervised Mr. Fowinkle, Mr. Fowinkle had attendance problems because of personal issues. *Id.* at 24. According to Mr. Jackson, Mr. Fowinkle told Mr. Slager, the then-acting Supervisor, about his personal problems, and Mr. Slager "handled" the situation. *Id.* at 24. Mr. Jackson stated that a performance evaluation of Mr. Fowinkle may not have been completed during the time period when Mr. Fowinkle was having personal problems, but that he could not recall without reviewing Mr. Fowinkle's file. *Id.* at 25.

Mr. Dunahoo served as the foreman and Mr. Slager served as the supervisor of Daniel Theriault, a Caucasian mechanic. Pl. Resp. To Def. Mot. For Summ. J., Ex. 14. Mr. Theriault received numerous safety violations, negative performance evaluations, and "to file" complaints from October 2000 through February 2002. *Id.* Mr. Slager suspended Mr. Theriault two times in 2001—the first time on May 3rd for a period of one day and the second time on October 2nd for a period of three days. *Id.* Mr. Dunahoo admitted in deposition testimony that Mr. Theriault was not demoted from mechanic to mechanic's helper. *Id.*

On February 6, 2001, Plaintiff filed a charge of discrimination with the EEOC, alleging that his demotion from crew leader to mechanic and the discipline he had received was because of his race or in retaliation for the filing grievances. Pl.'s Resp. Def.'s, Ex. 6. On February 15, 2001, Defendant received notice of Plaintiff's initial EEOC Charge. *Id.* After Plaintiff's demotion on March 1, 2001, Plaintiff filed a second EEOC Charge on March 7, 2001, which asserted that Defendant retaliated against Plaintiff by demoting him from mechanic to mechanic's helper because he filed an EEOC Charge on February 6, 2001. *Id.*, Ex. 9.; Aff. of Samuel L. Tune ¶ 3.

Plaintiff received a Right to Sue Letter from the EEOC on October 11, 2001. Pl.'s Am. Resp. p. 7. On January 7, 2002, Plaintiff filed suit in this Court, asserting claims

for discrimination based on race, retaliation, and hostile work environment/racial harassment, pursuant to 42 U.S.C. § 2000e, *et seq.* *Id.* On December 6, 2002, Defendant moved the Court for the summary adjudication of Plaintiff's claims. *Id.*

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment may be granted if no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Material facts are those facts which are defined by substantive law and are necessary in order to apply the law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id.*

In evaluating a motion for summary judgment, the evidence, facts, and any inferences must be viewed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Walborn v. Erie County Care Facility,* 150 F.3d 584, 588 (6th Cir.1998). Although hearsay evidence may not be considered on a motion for summary judgment, *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 927 (6th Cir.1999), evidentiary materials presented to avoid summary judgment otherwise need not be in a form that would be admissible at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thaddeus–X v. Blatter,* 175 F.3d 378, 400 (6th Cir.1999). Once a properly supported motion for summary judgment has been made, the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine

issue for trial." Fed.R.Civ.P. 56(e). Summary judgment is appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348.

## III. ANALYSIS

### A. Equitable Tolling

■ As an initial matter, pursuant to 42 U.S.C. § 2000e–5(e)(1), Defendant argues that Plaintiff's claims premised upon discrete acts occurring more than 300 days prior to the filing of Plaintiff's initial EEOC Charge are time-barred. Plaintiff filed his initial charge with the EEOC on February 6, 2001. Defendant therefore maintains that Plaintiff is barred from pursuing any claims for discrimination or retaliation based on any discrete acts occurring before April 18, 2000. Plaintiff, however, asserts that the Court should apply the doctrine of equitable tolling to any discrete acts that were untimely filed with EEOC. For the following reasons, the Court finds that Plaintiff is prohibited from premising his claims for retaliation or discrimination on any discrete acts occurring prior to April 18, 2000—300 days before his initial filing of an EEOC charge—absent the application of equitable tolling. The Court must, therefore, determine whether this case presents a situation where equitable tolling is appropriate.

#### 1. Discrete Acts of Retaliation and/or Discrimination

■ In *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Court stated that "[a] discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Morgan,* 536 U.S. at 120, 122 S.Ct. 2061. Discrete acts include such actions as termination, failure to promote, denial of transfer, or refusal to hire. *Id.*

at 122, 122 S.Ct. 2061. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice," and therefore, each discrete discriminatory act starts a new clock for filing a charge alleging that act. *Id.* at 122–23, 122 S.Ct. 2061. The Court held therefore that a claimant must file a charge within either 180 or 300 days of the date of the discrete act or lose the ability to recover for it. *Id.* at 120, 122 S.Ct. 2061.

■ Moreover, the Court noted that discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. *Id.* at 123, 122 S.Ct. 2061. Title 42, section 2000e–5(e)(1) of the United States Code does not bar an employee, however, from using the prior untimely filed acts as background evidence in support of a timely claim. *Id.* Additionally, the Court recognized that the equitable doctrines of estoppel and tolling may be used sparingly by courts to allow an employee to proceed on an untimely filed discriminatory or retaliatory act. *Id.* (citing *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)).

Courts have held that equitable tolling is appropriate in cases of active deception such as where an employee has been " 'lulled into inaction by her past employer, state or federal agencies, or the courts.' " *EEOC v. Dillard's Dep't Stores, Inc.,* 768 F.Supp. 1247, 1252 (W.D.Tenn.1991) (citing *Martinez v. Orr,* 738 F.2d 1107, 1110 (10th Cir.1984)). Likewise, it is appropriate in cases where an employee has been " 'actively misled' " or prevented in an extraordinary manner from asserting his or her rights. *Id.* (citation omitted); *see also Miller v. Marsh,* 766 F.2d 490 (11th Cir. 1985); *Fox v. Eaton Corp.,* 689 F.2d 91, 93 (6th Cir.1982).

In the instant action, Plaintiff filed his initial EEOC Charge on February 6, 2001, alleging discrimination and retaliation. On April 26, 2000, Plaintiff filed an internal charge of race discrimination with Defendant's EEC, alleging harassment, failure to promote, and refusal to provide training. On October 10, 2000, the EEC of MLG & W issued a letter finding no cause. The letter further notified Plaintiff that he had 300 days from the date of the alleged occurrence to file a charge with the EEOC.

These facts do not indicate that Defendant lulled Plaintiff into inaction or actively misled or prevented Plaintiff from asserting his rights. As such, the Court finds that equitable tolling is not appropriate in this case. Plaintiff, therefore, cannot premise his claims for discrimination or retaliation on discrete acts occurring before April 18, 2000. Such acts, however, may be considered as background evidence in support of a timely claim.

### 2. Timely Filing of Charge of Hostile Work Environment

■ Plaintiff argues that he was subject to hostile work environment/racial harassment.[2] Plaintiff appears to rely in

---

**2.** Plaintiff does not specifically assert a cause of action in the complaint for hostile work environment. Plaintiff does allege, however, that "the hostility levied against the Plaintiff in the workplace continued to intensify, including the utterances of racial remarks by foreman, Alan Williams, white male." Compl. ¶ 23. Furthermore, Defendant does not argue that Plaintiff failed to satisfy the jurisdictional requirement of asserting a claim for hostile work environment that was within the scope of the EEOC Charges. Instead, Defendant appears to assert that Plaintiff did not allege a claim of hostile work environment in the complaint. The Court finds, however, that Plaintiff alleged sufficient facts in the complaint to state a cause of action for hostile work environment/racial harassment.

part on acts occurring before April 18, 2000, to establish this claim. Before the Court can decide whether Plaintiff may rely on these discrete acts to establish a prima facie case of hostile work environment/harassment, the Court must determine whether Plaintiff met the jurisdictional requirement for bringing this claim.

■ In *Bray v. Palm Beach Co.,* 907 F.2d 150, 1990 WL 92672, *1–2 (6th Cir. 1990) (unpublished), the Court noted that "the cause of action stated in the complaint must fall within the scope of the EEOC investigation that is reasonably expected to grow out of the charge of discrimination that was filed with the EEOC." (citation omitted). The Court further stated that this requirement is jurisdictional, and therefore when the complaint is outside of the scope of the EEOC charge, a court lacks subject matter jurisdiction over the claim. *Id.* 907 F.2d 150, 1990 WL 92672 at *1. In determining the scope of the EEOC charge, the facts alleged in the body of the charge, and not the boxes marked on the charge, are the primary determinant. *Id.* 907 F.2d 150, 1990 WL 92672 at *2.

■ Plaintiff alleged in his first EEOC Charge that Defendant discriminated against him based on race and in retaliation. The charge specifically states:

I have been demoted and subjected to discipline since March 2000. I have filed grievance [sic] in those regards. In retaliation for filing those grievances, I have been issued unsatisfactory performance evaluations. During the period in which I was discriminated against, I was the only Black employee in my job classification.

. . . . .

I believe that I have been discriminated against because of my race, Black[,] and retaliated [against] for complaining about race discrimination in grievances in violation of Title VII . . . .

The second EEOC Charge filed by Plaintiff only asserts a claim for retaliation for filing the first EEOC Charge. Thus, Plaintiff did not explicitly assert in either EEOC charge that he was subject to a hostile work environment. The Court finds, however, that the cause of action stated in the complaint falls within the scope of the EEOC investigation that was reasonably expected to grow out of the charge of discrimination from the initial EEOC Charge. Plaintiff asserted that he was demoted and subjected to discipline as a result of race discrimination. An investigation of these allegations would have led the EEOC to examine whether a hostile work environment existed. The Court now must determine whether Plaintiff has timely filed a charge of hostile work environment with the EEOC.

■ In *Morgan,* the Court stated that "the incidents comprising a hostile work environment are part of one unlawful employment practice, [therefore,] the employer may be liable for all acts that are part of [the] single claim." *Morgan,* 536 U.S. at 125, 122 S.Ct. 2061. Accordingly, the employee is required only to file a charge within 180 or 300 days of any act that is part of the hostile work environment. *Id.*

In the instant action, on February 6, 2001, Plaintiff filed a charge alleging discrimination based on the discipline and demotion he had received. The discipline and negative evaluations were ongoing. Furthermore, this Court determined previously that Plaintiff's claim for hostile work environment was within the scope of the February 6, 2001 EEOC Charge. Accordingly, Plaintiff has satisfied the requirement of filing a timely charge of hostile work environment. All of Defendant's allegedly harassing acts may be considered, therefore, when evaluating whether Plaintiff established a prima facie case of hostile work environment/racial harassment.

## B. Race Discrimination Claim

Plaintiff alleges that Defendant discriminated against him when it negatively disciplined, evaluated, and demoted him. Specifically, Plaintiff asserts that his demotions to mechanic and then to mechanic's helper were the result of discrimination. As discussed previously, however, Plaintiff may not rely on his demotion to crew leader on March 1, 2000, to establish a prima facie case of discrimination because the demotion was a discrete act not timely filed. To prevail on a claim of disparate treatment discrimination, a plaintiff must show discriminatory animus. *Huguley v. General Motors Corp.*, 52 F.3d 1364, 1370 (6th Cir.1995). Discriminatory animus may be established by direct evidence or may be inferred from a prima facie showing of discrimination. *Id.*

### 1. Direct Evidence

"[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor" in the adverse employment decision at issue. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999) (citations omitted). Evidence is direct if it would prove the existence of a fact without any inferences or presumptions, if believed. *Lautner v. AT & T*, 106 F.3d 401, 1997 WL 26467, at *3 (6th Cir. 1997) (unpublished opinion); *Norbuta v. Loctite Corp.*, 1 Fed.Appx. 305, 314 (6th Cir.2001) ("Whatever the strength of ... evidence, it is not 'direct' evidence [where it] admits to more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact.") (unpublished opinion). If the plaintiff provides credible, direct evidence of discriminatory animus, the burden of persuasion shifts to the defendant to establish by a preponderance of the evidence "that it would have [taken the adverse employment action even] had it not been motivated by discrimination." *Jacklyn*, 176 F.3d at 926. Thus, the employer must do more than merely "articulate" its nondiscriminatory reason for its action. *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 710 (6th Cir.1985).

In the instant action, the adverse employment actions at issue which the Court may consider as timely filed include Plaintiff's April 25, 2000 suspension by Mr. Slager for five-days and his demotion from mechanic to mechanic's helper on March 1, 2001. Plaintiff offers the following as direct evidence of Defendant's discriminatory animus:

1) Kevin Jackson's alleged statement to Plaintiff, after Plaintiff's transfer to the Brunswick Road Garage and demotion to mechanic's helper in 2001, that "[y]ou can be right and although you're right, you'll be wrong;"

2) Manuel Luna's assertion that he recalled an instance in 2001 when Kevin Jackson made the comment, while discussing Mr. Jackson's former residence, that "as soon as one of the blacks moved in to [sic] that neighborhood he knew that the neighborhood was going to go down...;"

3) Mr. Luna's statement that a mechanic once called him a "F-ing wetback;"

4) James Summers' assertion that mid-year 2000 he heard Chris Proctor say that Mr. Proctor heard someone make the comment that "[i]f it wasn't for these dumb-ass n[-] we would have a better place to work;"

5) Mr. Summers' statement that he heard Kevin Jackson once make the statement that "the Civil War wasn't over;" and

6) Huberto Tagavilla's assertion that during the 1970's and/or early 1980's he heard people at work make racially derogatory phrases, such as "a dumb n[-]."

The statement made by Mr. Jackson to Plaintiff that "[y]ou can be right and although you're right, you'll be wrong" is not direct evidence because the trier of fact would have to make inferences or presumptions to determine that the statement was discriminatory in nature. Furthermore, Mr. Jackson's statement made in 2001 that "as soon as one of the blacks moved in to [sic] that neighborhood he knew that the neighborhood was going to go down..." is not direct evidence of discriminatory animus because in 2001 Mr. Jackson was no longer Plaintiff's foreman. Mr. Jackson served as Plaintiff's foreman from mid-December 1999 through March 1, 2000. Mr. Jackson gave Plaintiff negative performance evaluations during this time, and he was involved directly with Plaintiff's demotion from crew leader to mechanic on March 1, 2000. As discussed earlier, however, Plaintiff's demotion from crew leader to mechanic was more than 300 days before the filing of Plaintiff's initial EEOC Charge. The Court cannot conclude based on this statement alone that unlawful discrimination was at least a motivating factor in Defendant's decisions to suspend Plaintiff on April 25, 2000, or to demote Plaintiff on March 1, 2001, because neither involved the input of Mr. Jackson. The same is true of Mr. Tagavilla's assertion that he heard people at MLG & W make racially derogatory comments in the 1970's and/or 1980's.

 Likewise, the racial slur directed toward Mr. Luna is not direct evidence that discriminatory animus motivated Defendant's decisions to suspend Plaintiff on April 25, 2000, or to demote him on March 1, 2001, because the statement was made by a mechanic, and not a decision maker. Additionally, Mr. Summers' assertion that he heard Chris Proctor say that he heard someone make a discriminatory statement about African–Americans may not be used in determining whether discriminatory animus motivated Defendant's decisions be-cause it constitutes double hearsay. Furthermore, Mr. Summers admitted that he did not know who the "someone" was that allegedly made the statement or whether the statement was in fact made. Finally, Mr. Summers' assertion that Mr. Jackson made the comment that "the Civil War wasn't over," while potentially indicative of discriminatory animus generally, may not be considered as direct evidence that unlawful discrimination was at least a motivating factor in Mr. Williams', Mr. Slager's, Mr. Collins', or Ms. Lovett's collective or independent decisions to suspend Plaintiff on April 25, 2000, or demote him on March 1, 2001. Having determined that no direct evidence of discriminatory animus exists with respect to Plaintiff's suspension or his second demotion, the Court must determine whether Plaintiff has established a prima facie case of race discrimination.

### 2. Prima Facie Case

A plaintiff may establish a prima facie case of race discrimination by showing by a preponderance of the evidence that he 1) is a member of a protected group, 2) was subject to an adverse employment action, 3) was qualified for the position, and 4) was replaced by an individual outside of the protected class or was treated less favorably than a similarly-situated employee outside of the protected class. *Clayton v. Meijer, Inc.,* 281 F.3d 605, 610 (6th Cir.2002) (citations omitted). If the plaintiff is able to establish a prima facie case, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *Johnson v. University of Cincinnati,* 215 F.3d 561, 573 (6th Cir.2000) (internal citation omitted). If the defendant carries this burden, then the plaintiff must prove that the proffered reason was actually a pretext. *Id.* A plaintiff may establish pretext by showing that the proffered reason 1) has no basis in fact, 2) did not

actually motivate the adverse employment action, or 3) was insufficient to motivate the adverse employment action. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994).

Plaintiff, an African–American, is a member of a protected class. Furthermore, Plaintiff was demoted from a mechanic to mechanic's helper on March 1, 2001. Plaintiff has presented evidence that Mr. Dunahoo, Mr. Jackson, and Mr. Williams thought that Plaintiff was qualified to perform the job of mechanic, and Defendant has not attempted to argue that Plaintiff was unqualified. Prior to Plaintiff's promotion to crew leader, Plaintiff received satisfactory performance evaluations as a mechanic. The Court finds that Plaintiff has established by a preponderance of the evidence the first three elements of a prima facie case of race discrimination.

 Defendant argues, however, that Plaintiff failed to establish that any persons similarly situated to Plaintiff, i.e., who had the frequency and extent of performance problems that Plaintiff had, were treated more favorably than Plaintiff. In response to Defendant's argument, Plaintiff presented the employment file of Daniel Theriault, a Caucasian mechanic whose foreman was Mr. Dunahoo and whose supervisor was Mr. Slager. A review of Mr. Theriault's file indicates that Mr. Theriault had numerous safety violations, negative performance evaluations, and "to file" complaints from October 2000 through February 2002. Mr. Slager also suspended Mr. Theriault two times in 2001—the first time on May 3rd for one day and the second time on October 2nd for three days. Despite his negative performance documentation and suspensions, Mr. Theriault was not demoted from mechanic to mechanic's helper. The Court recognizes that Ms. Lovett made the final recommendation to demote Plaintiff from mechanic to mechanic's helper. The decision to demote Plaintiff, however, was premised apparently in large part on recommendations, reviews, and disciplinary actions either approved or instigated by Mr. Slager. The Court finds that Plaintiff has established by a preponderance of the evidence that he was treated less favorably than a similarly-situated employee outside of the protected class because Mr. Slager did not recommend or instigate the demotion of Mr. Theriault, who had a performance record as a mechanic similar to that of Plaintiff. Plaintiff has proved, therefore, a prima facie case of race discrimination.

 Defendant asserts that it has articulated a legitimate, nondiscriminatory reason for Plaintiff's demotion from mechanic to mechanic's helper, which is that Plaintiff's performance as a mechanic was so unsatisfactory as to warrant his demotion. Defendant argues that Plaintiff failed to establish that its reason is pretextual. Plaintiff maintains that his performance as a mechanic was not so unsatisfactory as to warrant a demotion because other mechanics have not been demoted for similar performance, as evidenced by Defendant's failure to demote Mr. Theriault. The Court finds that Plaintiff has provided sufficient evidence to establish that Plaintiff's performance was insufficient to motivate his demotion because Mr. Theriault's similarly documented poor performance did not result in his demotion. Accordingly, Defendant's motion for summary judgment with respect to Plaintiff's claim of race discrimination based on his demotion from mechanic to mechanic's helper is denied.

### C. Retaliation Claim

 Plaintiff asserts that Defendant retaliated against him in violation of Title VII.[3] In *Morris v. Oldham County Fiscal*

---

**3.** Plaintiff does not specifically assert a cause of action in the complaint for retaliation In

*Court,* 201 F.3d 784, 792 (6th Cir.2000), the Court modified the standard for a prima facie case of retaliation. The Court held that an employee must prove that "(1) [h]e engaged in activity protected by Title VII; (2) this exercise of protected rights was known to [the employer]; (3) [the employer] thereafter took adverse employment action against the plaintiff, *or the [employee] was subjected to severe or pervasive retaliatory harassment by a supervisor;* and (4) there was a causal connection between the protected activity and the adverse employment action *or harassment.*" *Id.* at 792 (emphasis in original); *but see Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000) (decided eleven months after *Morris,* but using previous standard for prima facie case of Title VII retaliation). If the employee establishes a prima facie case of retaliation, the burden of production of evidence shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its actions. *Id.* at 793. (internal citation omitted). If the employer meets this burden, then the employee must demonstrate by a preponderance of the evidence "that the proffered reason was not the true reason for the employment decision." *Id.* A plaintiff may establish pretext by showing that the proffered reason 1) has no basis in fact, 2) did not actually motivate the adverse employment action, or 3) was insufficient to motivate the adverse employment action. *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir.1994).

Plaintiff filed his first EEOC Charge on February 6, 2001, and he was subsequently demoted on March 1, 2001, from mechanic to mechanic's helper. Defendant received

notice of Plaintiff's EEOC Charge on February 15, 2001. The Court finds that Plaintiff has established that he engaged in activity protected by Title VII, the exercise of protected rights was known to Defendant, and Defendant subsequently took adverse employment action against Plaintiff.

 Defendant asserts that Plaintiff failed to establish the fourth element of a prima facie case of retaliation, i.e., that a causal connection exists between the protected activity and the adverse employment decision. To establish a causal connection, the plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken absent participation in the protected activity. *Id.* (citations omitted). Temporal proximity between the adverse action and the protected activity is insufficient to support an inference of retaliation when no other compelling evidence has been presented. *Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 229 (6th Cir.1987).

Defendant argues in effect that Plaintiff relies on temporal proximity alone to establish the "causal connection" element of retaliation. Defendant maintains that Plaintiff was informed as early as March 1, 2000, the date of Plaintiff's demotion from crew leader to mechanic, that if he failed to perform at an acceptable level he could face further disciplinary action. The only discrete act that occurred after April 18, 2000, 300 days prior to Plaintiff's timely EEOC filing of retaliation on February 6, 2001, was Plaintiff's demotion from mechanic to mechanic's helper on March 15, 2001.[4]

the complaint, Plaintiff does assert, however, that he filed an EEOC Charge alleging retaliation. Furthermore, he plead sufficient facts for the Court to find that he was alleging a claim for retaliation.

4. Based on *Morris,* when deciding whether the employee has established a prima facie case of "retaliation," the Court may be required to determine whether the employee has established a prima facie case of "retaliatory hostile work environment/harassment." Given the holdings in *Morris* and *Morgan,* it

The Court finds that Plaintiff has established sufficient evidence to support an inference that a "causal connection" existed between Plaintiff's internal EEC Charge and second EEOC Charge and Plaintiff's second demotion. Plaintiff filed an internal charge of race discrimination with the Equal Employment Compliance ("EEC") on April 26, 2000, alleging harassment, failure to promote, and refusal to provide training. Plaintiff alleged that Mr. Slager, Mr. Dunahoo, Mr. Williams, and Mr. Collins were the perpetrators of the discrimination against him.

Thereafter, Mr. Williams performed Two Minute Reviews of Plaintiff on June 12, July 12 and September 8, 2000. Plaintiff's overall performance ratings on these reviews were listed as "effective" with the comment "showing some improvement in job performance"—June 12, 2000; "effective" with the comment "needs to continue with improvements on [sic] job performance and attendance"—July 12, 2000; and "unsatisfactory"—September 8, 2000. On October 10, 2000, the EEC of MLG & W issued a letter finding no cause. On October 31, 2000, Mr. Williams completed a performance appraisal of Plaintiff, which Mr. Slager approved, for the period of March 1, 2000 to October 31, 2000. Despite two overall performance evaluations of "effective" during this time period, Mr. Williams rated Plaintiff's overall performance as "unsatisfactory." Mr. Williams' comments on the appraisal include statements such as "quality of repairs are not up to standard's [sic] due to come back's [sic]," "has a very limited knowledge," and "needs more training in trouble shooting and diagnostic skills." Furthermore, Mr.

Williams also stated that Plaintiff was offered additional training but refused it. Plaintiff, however, indicated on the employee comment section of the review that he was not offered additional training.

Moreover, on November 13, 2000, Ms. Lovett, Plaintiff, Mr. Slager, Mr. Williams, and other members of management and personnel met to discuss Plaintiff's most recent performance evaluation. On November, 20, 2000, Plaintiff was given 90 days to improve his work performance. After the 90 day time period ended, on March 1, 2001, Mr. Williams completed another performance evaluation of Plaintiff for the period of November 1, 2000 to February 28, 2001. Plaintiff received an overall performance evaluation of "unsatisfactory." In the areas of quality of work, quantity of work, dependability, and material utilization, Plaintiff received a rating of "unsatisfactory." Effective March 1, 2000, Ms. Lovett recommended to MLG & W's Personnel Department that Plaintiff be demoted from mechanic to mechanic's helper and reassigned to Defendant's Brunswick Service Center garage.

Thus, after Plaintiff's filing of an internal discrimination complaint, he received an overall unsatisfactory performance evaluation despite evaluations of effective during the time period. This negative performance evaluation appears to have culminated in Plaintiff's 90 day probation period. The probation period concluded with Plaintiff's demotion to mechanic's helper, less than fifteen days after the filing of an EEOC Charge. These facts, viewed in the light most favorable to Plaintiff, raise sufficient evidence for the Court

appears that Plaintiff in the instant action may use discrete acts that were untimely filed with the EEOC, i.e., his demotion from crew leader to mechanic, to proceed on a claim of "retaliation" based on "retaliatory harassment." Plaintiff asserts that he has established a prima facie case of "retaliation"

based on "retaliatory harassment." The Court need not address, however, Plaintiff's claim of "retaliation" based on "retaliatory harassment" because the Court finds that Plaintiff has established a prima facie case of "retaliation" based on the traditional prima facie elements of retaliation.

to infer that Defendant's demotion of Plaintiff to mechanic's helper and the protected activities in which Plaintiff engaged were causally connected.

■ The Court must now determine whether Defendant has articulated some legitimate, nondiscriminatory reason for its action. Defendant asserts in effect that Plaintiff's demotion to mechanic's helper was based on his poor work performance as evidenced by numerous poor performance evaluations and notations to his file. Plaintiff maintains, however, that Defendant's reason is pretextual because Michael Theriault, a mechanic who was also supervised by Mr. Slager, had as many poor performance evaluations and notations to his file but was not demoted to mechanic's helper. Based on this, the Court finds that Plaintiff has demonstrated by a preponderance of the evidence that Defendant's legitimate, nondiscriminatory reason was insufficient to motivate his demotion to mechanic's helper. Accordingly, Defendant's motion for summary judgment as to Plaintiff's claim for retaliation is denied.

### D. Hostile Work Environment/Racial Harassment

■ Plaintiff alleges that he was subjected to a hostile work environment based on his race. To establish a claim for hostile work environment/racial harassment, the plaintiff must prove that (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) defendant knew or should have known about the harassment and failed to take action. *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1078–79 (6th Cir.1999).

■ Plaintiff asserts that an atmosphere of racial intolerance, replete with stereotypical epithets from management

and employees, permeated Defendant's workplace. Plaintiff introduced the deposition testimony of Manuel Luna, James Summers, and Huberto Tagavilla. Mr. Luna stated that Kevin Jackson made the comment, while discussing Mr. Jackson's former residence, that "as soon as one of the blacks moved in to [sic] that neighborhood he knew that the neighborhood was going to go down. . . ." Mr. Luna also stated that a mechanic once called him an "F-ing wetback." No supervisor nor foreman was present, however, when the mechanic made the comment. Furthermore, Mr. Luna did not report the incident to anyone. Mr. Luna also asserted that there were rumors of racial remarks being made, although he could not recall specifically what they were.

Mr. Summers stated that he heard Chris Proctor say that Mr. Proctor heard someone make the comment that "[i]f it wasn't for these dumb-ass n[-] we would have a better place to work." As the Court noted earlier, however, this cannot be used as evidence because it is clearly hearsay. Mr. Summers even stated that he did not know whether Mr. Proctor's statement was true or whether Mr. Proctor was trying to "stir up trouble." Additionally, the incident was never reported to a member of management. Mr. Summers did assert, however, that Kevin Jackson once made the statement that "the Civil War wasn't over."

Mr. Tagavilla stated that during the 1970's and/or early 1980's he heard people at work use racially derogatory labels, such as "a dumb n[-----]." Mr. Tagavilla further asserted that he had not heard any racial remarks in the last ten years. Mr. Tagavilla did opine, however, that he felt that he was being harassed and that the work environment appeared to be reverting back to a 1960's mentality. Mr. Taga-

villa stated that he did not have any facts to support his feeling.

Plaintiff also contends that he was subject to unwelcome harassment because he was subject to harsher discipline than his Caucasian counterparts and because he received an overwhelming amount of negative documentation. Plaintiff cannot rely, however, on the number of written documents/evaluations alone to establish that he was subject to unwelcome harassment. Plaintiff's managers maintained detailed records of the performance of all of the employees who they managed. Furthermore, it is apparent that such documentation, whether positive or negative, also was performed on Caucasian employees, as evidenced by the voluminous personnel file of Mr. Theriault. As such, the Court cannot conclude that the documentation itself was based on race. The question that arises, however, is whether the negative evaluations were based on Plaintiff's race.

Given the inconsistencies presented regarding the facts and circumstances surrounding some of Plaintiff's performance evaluations and disciplinary actions, the Court finds that the negative documentation may be considered as evidence that at least some of Plaintiff's negative performance evaluations were based on race. For instance, Mr. Slager in deposition testimony stated that three trenchers that he inspected on which Plaintiff had performed PMs had not been moved since Plaintiff's PMs. Mr. Slager suspended Plaintiff as a result of his inspection. At least one of the trenchers, however, apparently was moved because Defendant's records indicate that from January 20, 2000, through February 8, 2000, the equipment had an increase of 20 meter hours. Furthermore, Plaintiff asserted that all of the trenchers had been in service in excess of twenty-five hours, before Mr. Slager performed the February 9, 2000 inspection. Likewise, a review performed by Kevin Jackson indicated that Plaintiff did not complete his PMs in January 2000. On February 3, 2000, Mr. Jackson reiterated to Mr. Slager that Plaintiff and the third shift of the North Service Center failed to complete the PMs for January 2000. Defendant's computerized printouts indicate, however, that there were no incomplete PMs at the North Service Center during January or February 2000. Based on the foregoing, the Court concludes that Plaintiff has established by a preponderance the first three elements of a prima facie case of hostile work environment, i.e., Plaintiff is an African American who was subject to unwelcome harassment based on race.

Defendant appears to argue, however, that the alleged harassment did not affect a term, condition, or privilege of employment. Harassment affects a "term, condition or privilege of employment" if it is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and to create an abusive working environment. *Moore*, 171 F.3d at 1079. In sum, the plaintiff's evidence must be sufficient to establish that the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the plaintiff's ability to do his job. *Erebia v. Chrysler Plastic Prods. Corp.*, 772 F.2d 1250, 1256 (6th Cir.1985). The conduct must be sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as such. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Courts must consider the totality of the circumstances in determining whether, objectively, the alleged harassment constitutes a hostile work environment. *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir.1999). Appropriate factors to consider include the fre-

quency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with an employee's work performance. *Harris*, 510 U.S. at 23, 114 S.Ct. at 371. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). Isolated incidents alone must be extremely serious to amount to discriminatory changes in the terms or conditions of employment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir.2000); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2nd Cir.1998). In *Livingston*, for example, the court held that a supervisor calling the Latino claimant a "Spic" three times was sufficiently severe to objectively constitute harassment. *Id.*

Plaintiff asserts that as a result of the negative performance evaluations and disciplinary actions, he could not sleep at night and would return to the workplace to make certain that he had not made mistakes. Furthermore, Plaintiff maintains that his anxiety level increased to the point of requiring medication. Based on the totality of the circumstances, the Court finds that sufficient evidence exists for a reasonable person to find Plaintiff's work environment hostile or abusive. The Court's determination is based on the number of negative evaluations and the severity of the resulting disciplinary actions which could be found by the trier of fact to have been motivated by race, when viewed in light of Defendant's inconsistent assertions. Moreover, the Court notes that the conduct is of the type that could be found to unreasonably interfere with an employee's work performance. While the comments allegedly heard by other employees are for the most part inadmissible

or irrelevant when determining whether the harassment was so severe or pervasive to alter the terms or conditions of employment, the Court recognizes that comments by Mr. Jackson, such as the Civil War comment, bolster Plaintiff's assertion that a hostile work environment existed. The Court concludes that Plaintiff has established that Defendant's conduct could be found to be so severe or pervasive as to alter the conditions of the Plaintiff's employment. The Court also finds that Plaintiff has proven by a preponderance of the evidence that Defendant knew or should have known about the conduct in light of the fact that managers, supervisors, and department heads were involved in the disciplinary actions. Accordingly, the Court finds that Plaintiff has sufficiently alleged a prima facie case of hostile work environment such that Defendant's motion for summary judgment must be denied.

## IV. CONCLUSION

For the reasons stated herein, Defendant's motion for summary judgment is granted with respect to Plaintiff's claims for race discrimination and retaliation premised on discrete acts occurring before April 18, 2000. Defendant's motion for summary judgment is denied, however, as to Plaintiff's claims for race discrimination and retaliation based on Plaintiff's demotion on March 1, 2001, from mechanic to mechanic's helper. Furthermore, the Court denies Defendant's motion for summary judgment with respect to Plaintiff's claim for hostile work environment/racial harassment.